# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* ) ) | Case No.  2:21-MJ-03213 |
| SAFETY DEPOSIT BOXES 2804, 5611, AND 7321, AND THEIR CONTENTS, previously taken from U.S. Private Vaults, and now in storage at the FBI ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See caption above*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956, 21 U.S.C. §§  841, 846, 26 U.S.C. § 7201, and 31 U.S.C. § 5324. | See affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Lyndon Versoza
_____
*Applicant's  signature*

Postal Inspector Lyndon Versoza
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's  signature*

City and state: Los Angeles, CA _____

Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1956 (money laundering), 21 U.S.C. §§ 841 and 846 (drug trafficking), 26 U.S.C. § 7201 (tax evasion), and 31 U.S.C. § 5324 (structuring) (the "Target Offenses") namely:

a.   Evidence of wealth, such as cash over $5,000, financial instruments, cryptocurrencies, and documents and records referring or relating to the same; and

b.   Records or items containing indicia of ownership or control of a safety deposit box or its contents such as rental agreements or references to specific persons or their contact information.

**AFFIDAVIT**

I, Lyndon A. Versoza, being duly sworn, hereby depose and state
as follows:

      **I.**    **TRAINING AND EXPERIENCE**

      1.    I am a United States Postal Inspector employed by the
United States Postal Inspection Service ("USPIS"), Los Angeles
Division, in Los Angeles, California, where I have served since
June 2005.  Currently, I am responsible for investigating
criminal violations of money laundering and structuring laws,
such as when the services of the United States Postal Service
are employed by criminals as part of the means to launder or
conceal illicit funds, and/or avoid banking reporting
requirements.  I am also one of seven Postal Inspectors in the
U.S. currently designated by USPIS as a Subject Matter Expert
("SME") in money laundering investigations.  As a SME, I have
spoken at money laundering conferences and provided training to
the financial and banking industry and other law enforcement
agents. I have also received both formal and informal money
laundering training from USPIS and other government and private
agencies.  During my 16-year career as a Postal Inspector, I
have investigated: mail thieves, burglars, rapists, murderers,
armed robbers, prison and street gangs, drug trafficking
organizations, and perpetrators of financial violations

(including money launderers, darknet vendors, digital currency launderers, identity thieves and fraudsters).  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking. In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking domestically and internationally.  In that capacity, I also earned a designation by USPIS as a SME in Child Exploitation Investigations.

2.    From 2002 to 2005, prior to my service as a US Postal Inspector, I served as a law enforcement officer with the US Immigration and Naturalization Service, which later became part of the US Department of Homeland Security.  In this capacity I enforced immigration and customs law at an international airport and seaport, and later, worked in an intelligence unit for local and national counter-terrorism and smuggling operations.

3.    I am familiar with the facts and circumstances described herein.  This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly.  This affidavit does not purport to set forth my complete knowledge or understanding of

- 2 -

the facts related to this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.  All figures, times, and calculations set forth herein are approximate.

## II.   SUMMARY AND PURPOSE OF AFFIDAVIT: SEARCH AND GPS WARRANTS

4.   This affidavit is made in support of an application for a warrant to search Safety Deposit Box Numbers 2804, 5611 and 7321 (hereinafter the "JAMES SAFETY DEPOSIT BOXES"), used by DAVID JOSEPH JAMES, and which were previously seized from U.S. Private Vaults, Inc., for violations of 18 U.S.C. § 1956 (money laundering), 21 U.S.C. §§ 841 and 846 (drug trafficking), 26 U.S.C. § 7201 (tax evasion), and 31 U.S.C. § 5324 (structuring) (the "Target Offenses").  The JAMES SAFETY DEPOSIT BOXES are currently held in the custody of the FBI in Los Angeles, CA.

5.   This affidavit is made in support of an application for a warrant authorizing the disclosure of cell-site and GPS information, as well as the use of a cell-site simulator, also known as a "Stingray," as defined or discussed within the application, at such intervals and times as the government may request, and the furnishing of all information, facilities, and technical assistance necessary to accomplish said disclosure unobtrusively, which disclosure will establish the approximate location of the following cellular telephones for a period of 45

- 3 -

days:

        a.   310-880-1299, a cellular telephone issued by AT&T and used by DAVID JOSEPH JAMES ("JAMES"), (hereinafter "SUBJECT TELEPHONE").

6.   I also seek authorization under 18 U.S.C. § 3103a(b), for reasonable cause shown below, to delay notification of the proposed order for a period of 30 days from the date that the disclosure ends.

7.   As described more fully below, I respectfully submit there is probable cause to believe that cell-site information, GPS information, and information from a cell-site simulator, likely to be received concerning the approximate location of the SUBJECT TELEPHONE will constitute or yield evidence of the location of DAVID JOSEPH JAMES and his conspirators who are the subject of an investigation the Target Offenses.

<u>Summary</u>

8.   During the execution of a federal seizure warrant for the nests of safety deposit boxes of an indicted safety deposit box company, federal agents inventoried all of the safety deposit boxes at USPV including the JAMES SAFETY DEPOSIT BOXES, which collectively contained $3,143,600 in US Currency (Box Number 2804 contained $334,200, Box Number 5611 contained $952,600, Box Number 7321 contained $1,856,800). The cash from all three boxes were isolated and separately presented to drug

detecting K9s who alerted to the odors of an illegal drug. According the FBI Case Agent, an attorney made a claim for the JAMES SAFETY DEPOSIT BOXES on behalf of her client, JAMES.  I reviewed records from AT&T for the SUBJECT TELEPHONE and learned that the SUBJECT TELEPHONE is active in JAMES' name and has been his phone number with AT&T since 2014. I reviewed JAMES' criminal history and saw that he has been convicted multiple times for state felony and misdemeanors violations of California Penal Code 337A.1 (Pool Selling/Bookmaking).  A review of his financial records shows that JAMES in engaged in structuring. Structuring is a form of hiding illegal income that a structurer is trying to keep undetected from the government.

### III. __PROBABLE CAUSE STATMENT__

9.   From my role as a case agent in the investigation as well as from speaking with the case agents from the Federal Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA") and reading their reports, I know that U.S. Private Vaults is a business in a strip mall that rents safety deposit boxes anonymously. It is owned and managed by criminals who engage in money laundering, drug trafficking, and structuring, among other offenses. Its business model is designed to appeal to criminals for customers. It charges many times what banks do for similar safety deposit box rentals, but staff conduct countersurveillance for customers, alert them to law

enforcement investigations, and structure transactions for them to avoid filing currency reports--in addition to providing them a place to store criminal proceeds anonymously. USPV also launders for its customers cash that is purported to be drug proceeds by converting it into precious metals or wire transfers. The great majority of USPV customers pay cash to rent their safety deposit boxes, at least some of which USPV then deposits into their own bank account, which it uses to pay its operating expenses. By using its customers' criminal proceeds to maintain its own anonymous facility for the storage of criminal proceeds, USPV engages in money laundering.

10.   I know from reading the indictment that on March 9, 2021, USPV was indicted by a federal grand jury for conspiring with its customers and others to launder money, distribute drugs, and structure financial transactions to avoid currency reporting requirements.  A copy of that indictment is attached and incorporated.

11.   Beginning on March 22 through March 26, 2021, I, along with agents from USPIS, FBI and DEA executed federal search and seizure warrants at USPV which authorized, among other things, seizing the nests of safety deposit boxes at USPV as evidence and instrumentalities of the offenses committed by USPV.  The warrants did not authorize criminal searches of the contents of the individual boxes but specified that agents would conduct an

inventory of the contents in accordance with their written procedures, and were authorized to look for contact information in those individual boxes in order to notify the boxholders of the seizure so that they could seek the return of their property. An inventory search was conducted on all the boxes at USPV, including the JAMES SAFETY DEPOSIT BOXES.

A.   JAMES Asserts he Rented the JAMES SAFETY DEPOSIT BOXES

12.   From reviewing an email and speaking with the FBI Case Agents, I learned that on about April 22, 2021 an attorney representing JAMES asserted that the JAMES SAFETY DEPOSIT BOXES belong to JAMES.

13.   On July 6, 2021, I reviewed FBI documents that summarized the inventory of the JAMES SAFETY DEPOSIT BOXES.  I also reviewed photos and videos taken by law enforcement during the inventory of the boxes:

a.   Box Number 2804 contained unorganized bundles of $100 bills, bundled in thick and thin rubber bands. This box had an Executor Notification letter bearing JAMES' name and the SUBJECT TELEPHONE.  It also contained a photocopy of JAMES' driver's license.  FBI later counted this cash and determined that it contained $334,200.  I also reviewed photos taken by the FBI of the bundles of bills from this box.  I observed that of the bills I observed, most were older.  I also observed that some bundles may have had a few newer $100 bills within the

- 7 -

bundle, which I recognized by the different paper color.

b.   Box Number 5611 contained Executor Notification documents listing the name and SUBJECT TELEPHONE for JAMES, and cash. According to the FBI, the cash was counted and totaled $952,600 in US currency.  In the FBI inventory search notes, an agent observed that several of the stacks of bills were stained red, possibly from "dye packs".  A Postal Inspector told me that some of the FBI agents who conducted the inventory of box 5611 have been trained on bank robberies and recognize the stains from their training.  I know that dye packs are a tool used to foil bank robberies and work by staining with dye stolen currency so that it can be later be identified.  On July 6, 2021, I reviewed the video captured during the inventory of this box and observed, as described in the FBI notes, that several bundles of $100 bills had red stains on their edges.  I also observed that the bills I can see most were the series printed in or around 2006.  I did not see many bundles with the newer bills.

c.   Box Number 7321 also contained executor documents bearing the name of JAMES and his driver's license.  Box 7321 also contained large stacks of rubber banded bundles of $100 bills, which was later counted and totaled $1,856,800 in US Currency.  This box was inventoried by a separate team of agents, almost four hours after Box 5611 was inventoried.  Some

of the cash in Box 7321 was also observed to have the same kind of red stains as in Box 5611.

B.   Drug Detecting K9 Alerted to the Cash in the JAMES SAFETY DEPOSIT BOXES

14.   On July 6, 2021 I read a declaration from Chino Police Officer Brendan Rowland, who handles a certified drug detecting K9, "Kobra."  From his declaration, I learned that on March 23, 2021, at approximately 11:45 pm, while the search warrant for USPV was being executed, federal agents presented the cash from BOX 2804 to Kobra.  Officer Rowland said in his declaration that "Kobra alerted to the presence of the odor of illegal drugs emitting from" Box Number 2804.

15.   I also spoke with Officer Rowland who told me that: Kobra has received 240 hours of basic training and receives continual training every week.  As part of her regular training and yearly certification process, Kobra is subjected to blind, controlled tests in which different types of illegal drugs are hidden in different places in a large training facility.  Her handler does not know where the drugs are.  If the K9 alerts to an area that does not contain drugs, or fails to locate any of the drugs, she would fail and not be certified.

16.   On July 6, 2021, I read a declaration from El Monte Police Detective who handles a drug detecting K9, "Rico." From his declaration I learned that on March 23, 2021, at approximately 02:53 am, while the search warrant for USPV was

being executed, federal agents presented the cash from BOX 5611 to "Rico." Detective Girgle said in his declaration that "Rico conducted a search of the contents of safe number 5611 and alerted to the presence of scent of narcotics on or in the US Currency."

17. On July 6, 2021, I read a declaration from El Monte Police Detective who handles a drug detecting K9, "Rico." From his declaration I learned that on March 23, 2021, at approximately 06:05 am, while the search warrant for USPV was being executed, federal agents presented the cash from BOX 7321 to "Rico." Detective Girgle said in his declaration that "Rico conducted a search of the contents of safe number 7321 and alerted to the presence of scent of narcotics on or in the US Currency."

18. I previously spoke with Detective Girgle on April 22, 2021, who told me: Rico must receive a minimum of 320 hours of training per year, but actually receives more. As part of his yearly certification process, Rico is subjected to a blind, controlled test in which different types of drugs are hidden in different places in a large training facility. His handler does not know where the narcotics are. If Rico alerts to an area that does not contain drugs, or fails to locate any of the narcotics, he would fail and not be certified.

C.   The SUBJECT TELEPHONE belongs to JAMES

19.   On July 1, 2021, I called the SUBJECT TELEPHONE, which was listed on the executor forms in the JAMES SAFETY DEPOSIT BOXES.  Although he did not answer, I confirmed that the phone was active when I received a text message from the SUBJECT TELEPHONE stating "Sorry, I can't talk right now."

20.   On July 6, 2021, I received records from AT&T and confirmed that the SUBJECT TELEPHONE was current and registered in to DAVID JOSEPH JAMES in Santa Monica, California, which is within the Central District of California.  JAMES has had the number since 2014.

D.   JAMES's Criminal History

21.   On July 6, 2021, I reviewed JAMES' criminal history. From this review I learned that JAMES has several state arrests and convictions tied to state violations of "Pool Selling/Book Making," California Penal Code 337A.1.  In 1993 and 1994, JAMES was arrested for the Book Making violation.  The arrest record did not show a disposition for these 1993 and 1994 arrests.  In 1995 JAMES was convicted of felony Book Making.  In 1999 he was again convicted of the same violation.  In 2002, JAMES was arrested for the same violation, however, the criminal record I reviewed did not show a disposition for this arrest.

E.   JAMES's Financial Activity

22.   On July 6, 2021, I reviewed a response to my inquiry

- 11 -

with the Franchise Tax Board and learned that the state of California has no record of JAMES having filed for taxes during the requested period, which went back to 2014.

23.  On July 6, 2021, I reviewed USPS financial records related to JAMES.  From this review I learned that JAMES has been involved in avoiding reporting requirements by structuring cash purchases of USPS Money Orders. For example:

a.  On August 13, 2018, JAMES or persons buying on JAMES' behalf purchased $10,000 in USPS Money Orders, which is over the $3,000 reporting threshold.  However, to avoid the reporting requirement, on the same day, the buyer(s) went to four post offices and bought $2,500 at each one.  The $10,000 of money orders were later negotiated at an auction with the payor being written in as DAVID JAMES with the same address found in the JAMES SAFETY DEPOSIT BOXES.

b.  On October 29, 2018, JAMES or persons buying on JAMES' behalf, bought $7,000 in USPS Money Orders, which is over the $3,000 reporting threshold. However, to avoid the reporting requirement, the buyer(s) visited three post offices and bought $2,000 at one post office and $2,500 in two other post office. The $7,000 money orders were later negotiated at an auction with the payor being written in as DAVID JAMES with his known address in Santa Monica, California

c.  On August 5, 2019, JAMES or persons buying on

- 12 -

JAMES' behalf bought $7,000 in USPS Money Orders, which is over
the $3,000 reporting threshold. To avoid the reporting
requirement, the buyer(s) visited three post offices on the same
day and bought $2,000 at one post office, $2,600 and $2,400 in
two other post office. The $7,000 money orders were later
negotiated at an auction with the payor being written in as
DAVID JAMES with his known address in Santa Monica, California

        d.    On August 12, 2019, JAMES or persons buying on
JAMES' behalf purchased $9,500 in USPS Money Orders.  To avoid
the reporting requirement, the buyer(s) went to five post
offices and bought between $500 to $2,500 at each one, avoiding
the $3,000 reporting threshold. The $9,500 money orders were
later negotiated at an auction with the payor being written in
as DAVID JAMES with his known address in Santa Monica,
California.

    24.  Based on my training and experience, I know that it is
extremely unusual to find over $3.1 million in cash in one
place. Even successful and professional drug traffickers and
money launderers rarely have so much cash, as it is inherently
suspicious, and very difficult to spend; cash transactions of
$10,000 or more generate currency transaction reporting
requirements.  Having over $3.1 million in cash, which is an
extremely large amount, and coupled with the canine alert and
the bundling, rubber-banding, and dye-pack stained and other

characteristics of the cash that I describe in this affidavit,
indicates that JAMES is involved in criminal activity.

25.   I know that banks do not generally provide cash
bundled in rubber bands.  Because large amounts of cash are
difficult to spend, heavy to carry, and easy to lose track of,
as opposed to the convenience of the banking system, I believe
that it is highly unusual for any large legal transactions to
occur in cash.

26.   As previously mentioned, the cash in the box is old, I
observed in the video recording of the cash that most of the top
bills were from the 2006 series.  Due to inflation, I believe
that legitimate business or persons do not generally hold over
$3,100,000 in cash in a storage vault.  The average cost of
yearly inflation of 3.1% would mean that the storage is costing
its owner almost $100,000 per year.

F.   <u>TECHNICAL BACKGROUND REGARDING CELL-SITE SIMULATORS</u>

27.   Based on my training and experience and my conversations
with other agents and investigators, I understand the following
regarding cell-site simulators:

28.   Cell-site simulators, commonly referred to as a
"Stingray," function by transmitting as a cell tower.  In response
to the signals emitted by the simulator, cellular devices in the
proximity of the device identify the simulator as the most

- 14 -

attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.

29.  A cell-site simulator receives and uses an industry standard unique identifying number (e.g., Electronic Serial Number (ESN), Mobile Equipment Identifier (MEID), International Mobile Subscriber Identity (IMSI), International Mobile Equipment Identity (IMEI), Mobile Station Identity (MSID), Mobile Directory Number (MDN) or the Universal Fleet Member Identity (UFMI)) that is assigned by a device manufacturer or cellular network provider. When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator.  Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.

30.  By transmitting as a cell tower, cell-site simulators acquire the unique identifying information from cellular devices. This identifying information is limited, however.  Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications.  Moreover, cell-site simulators do not collect the contents of any communication.

This includes any data contained on the phone itself: the simulator does not remotely capture emails, texts, contact lists, images, or any other data from the phone. In addition, cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

G.   INTENDED USE OF THE CELL-SITE SIMULATOR AND DELETION OF NON-TARGET DATA

31.  Investigators intend to use the cell-site simulator to send signals to the **SUBJECT TELEPHONE** that will cause the **SUBJECT TELEPHONE**, and non-target cellular phones on the same provider network in close physical proximity, to emit unique identifying information, which the cell-site simulator will collect. Investigators will then use the information collected by the cell-site simulator to determine the physical location of the **SUBJECT TELEPHONE**. Investigators plan to use the cell-site simulator to determine unique identifiers at multiple locations and/or multiple times at the same location.

32.  Although the cell-site simulator will collect the unique identifiers not only of the **SUBJECT TELEPHONE**, but also identifiers belonging to nearby non-target cellular telephones, these latter identifiers will not be used by law enforcement for investigative purposes, just as the extraneous incoming and outgoing telephone numbers necessarily recorded by conventional pen registers and trap-and-trace devices are not used for affirmative investigative purposes. Absent further order of the court, law enforcement will

- 16 -

make no investigative use of information concerning non-targeted cellular devices other than distinguishing the **SUBJECT TELEPHONE** from all other devices.   Once law enforcement has located the **SUBJECT TELEPHONE**, it will delete all information not associated with the **SUBJECT TELEPHONE.**

33.   The cell-site simulator may interrupt cellular service of cellular devices within its immediate vicinity.   Any service disruption will be brief and temporary, and all operations will attempt to limit the interference with cellular devices.

H.   GROUNDS FOR SEALING AND DELAYING NOTICE

34.   Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant, as well as the return to the warrant. I also believe that reasonable cause exists to delay the service of the warrant as normally required for a period of 30 days beyond the end of the disclosure period pursuant to 18 U.S.C. § 3103a(b) and, pursuant to 18 U.S.C. § 2705(b), to enter an order commanding the Carrier not to notify any person, including the subscriber of the **SUBJECT TELEPHONE**, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the Carrier complies with the warrant or such later date as may be set by the Court upon application for an extension by the United States.   There is

- 17 -

reason to believe that such notification will result in (1) flight from prosecution; (2) destruction of evidence, or (2) otherwise seriously jeopardizing the investigation.

35.  Furthermore, there is good cause for the warrant to be issued such that the information may be provided to law enforcement at any time of the day or night because in my training and experience, and knowledge of this investigation, DAVID JOSEPH JAMES and his accomplices and co-conspirators (the "TARGET SUBJECTS") do not confine their activities to daylight hours, and it is often even more difficult to conduct surveillance at night.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES

36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

37.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently

downloaded or viewed content and may also be recoverable months or years later.

38. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

39. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

40. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps"

- 19 -

that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

42. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

43. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

- 20 -

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

**IV.  <u>CONCLUSION</u>**

45.  For all of the above reasons, there is probable cause to believe that prospective cell-site information, GPS information, as well as information from a cell-site simulator, likely to be received concerning the approximate location of the **SUBJECT TELEPHONE**, currently within, or being monitored or investigated within, the Central District of California, will constitute or yield evidence of the location of TARGET SUBJECTS and aid in the investigation of the TARGET SUBJECTS.

46.  Also for the reasons stated above, there is also probable cause to believe that evidence and proceeds of the Target Offenses, as described more particularly in Attachment B, are in the JAMES SAFETY DEPOSIT BOXES.


Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of July, 2021.




_____
UNITED STATES MAGISTRATE JUDGE

- 21 -

FILED
CLERK, U.S. DISTRICT COURT

03/09/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>U.S. PRIVATE VAULTS, INC.,<br>  California Corporate<br>  Number C3405297,<br><br>        Defendant. | CR 2:21-cr-00106-MCS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1956(h): Conspiracy<br>to Launder Money; 21 U.S.C. § 846:<br>Conspiracy to Distribute<br>Controlled Substances; 18 U.S.C.<br>371: Conspiracy to Structure<br>Transactions; 18 U.S.C.<br>§ 982(a)(1), 21 U.S.C. §§ 853 and<br>881(a)(6), 28 U.S.C. § 2461(c) and<br>31 U.S.C. § 5317(c): Criminal<br>Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1956(h)]

A.    INTRODUCTORY ALLEGATIONS

1.    At times relevant to this Indictment:

a.    Defendant U.S. PRIVATE VAULTS, INC. ("USPV"), a Nevada Corporation registered with the California Secretary of State, was in the business of renting safety deposit boxes to individuals who wished to do so anonymously.

b.    Co-conspirator USPV Officer was an officer of USPV and

one of its owners.  USPV Officer dealt in marijuana, in violation of the laws of California, as well as cocaine.

c.    Co-conspirator USPV Manager was the manager of USPV. USPV Manager helped USPV Officer arrange drug deals within USPV, and helped USPV customers avoid detection by law enforcement, including by advising them to structure their cash purchases to avoid reporting requirements.

d.    Co-conspirator Gold Business was a dealer in precious metals and jewelry, and shared the same space as USPV, as well as some employees.  Gold Business helped USPV customers convert their cash into gold, and structured their cash transactions to avoid federal reporting requirements.

e.    Co-conspirator USPV Representative One was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative One instructed USPV customers how to structure transactions to avoid federal reporting requirements.

f.    Co-conspirator USPV Representative Two was a representative of USPV, and an owner of co-conspirator Gold Business. USPV Representative Two instructed USPV customers how to structure transactions to avoid federal reporting requirements.

B.    THE OBJECTS OF THE CONSPIRACY

2.    Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant USPV conspired with others known and unknown to the Grand Jury to launder money, in violation of Title 18, United States Code, Section 1956, namely:

a.    to knowingly conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity,

that is, the distribution of controlled substances, with the intent to promote the carrying on of that specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

　　　　b.　to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

　　　　c.　to knowingly conduct and attempt to conduct financial transactions involving the proceeds of specified unlawful activity, that is, the distribution of controlled substances, knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

C.　MANNER AND MEANS OF THE CONSPIRACY

　　3.　The objects of the conspiracy were carried out and were to be carried out, in substance, as follows:

　　　　a.　Defendant USPV would adopt business practices that attracted customers in possession of proceeds from criminal offenses, including drug trafficking, and not law-abiding persons.  Such practices included: (1) touting the anonymity of the safety deposit rentals that defendant USPV would provide, including by advertising "we don't even want to know your name"; (2) boasting that, unlike banks, its anonymous safety deposit box rentals did not require customer information that "can be easily accessed by government agencies (such as the IRS)"; (3) making arrangements for the payment

3

of the rental fees in cash and other ways that would be untraceable;
(4) issuing safety deposit box keys that were unmarked and unnumbered
so that law enforcement could not determine that the keys unlocked
safety deposit boxes at USPV; and (5) charging safety deposit box
rental rates several times higher than those at banks.

b.   USPV Officer would capitalize defendant USPV with the
proceeds of his illegal drug trafficking.

c.   USPV Officer would invite other drug traffickers who
knew and trusted him because of his illegal drug trafficking to store
the proceeds of their drug trafficking at defendant USPV.

d.   Employees of defendant USPV would conduct counter
surveillance of the neighborhood and warn customers when they
observed law enforcement.

e.   Agents of defendant USPV would instruct customers to
structure transactions to avoid currency transaction reports
including by purchasing gold and other precious metals through Gold
Business, which would structure transactions and not file required
currency reports.

f.   If agents of defendant USPV learned that law
enforcement was interested in searching or seizing the contents of a
particular customer's safety deposit box, they would attempt to warn
the customer, delay law enforcement, or even remove all but a nominal
amount of cash from the box for the customer, to prevent law
enforcement from discovering and seizing the bulk of the cash.

g.   Defendant USPV would deposit the cash proceeds it
received from its customers for safety deposit box rentals, which
included proceeds from the distribution of controlled substances,
into its bank account, and then use those proceeds to maintain USPV's

4

anonymous storage facilities for its criminal customers.

       h.   USPV Officer and USPV Manager would negotiate drug deals illegal under California law within the secured space of USPV, and USPV Officer would store the cash proceeds from drug deals within a safety deposit box at USPV.

       i.   USPV Manager would accept cash purportedly from illegal drug sales, and structure transfers of it to Gold Business in amounts not greater than $10,000 at a time in exchange for wire transfers that purported to be for the sale of precious metals.

COUNT TWO

[21 U.S.C. § 846]

4.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

5.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to distribute controlled substances, including marijuana, a Schedule I controlled substance, and cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and (b)(1)(D).

B.   MANNER AND MEANS OF THE CONSPIRACY

6.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

7.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but not limited to the following:

Overt Act No. 1:  On June 28, 2019, USPV Manager distributed within USPV's business location six different butane hash oil vape cartridges containing THC to someone he believed to be a drug trafficker, but who was, in fact, a confidential informant working with law enforcement ("Confidential Informant 3"), as samples of what

6

defendant USPV could provide in bulk.

Overt Act No. 2: On July 26, 2019, USPV Officer met Confidential Informant 3 within USPV to sell him 1,000 vape cartridges containing THC.  USPV Officer delivered the cartridges in the parking lot of USPV, and received in exchange $8,000 in cash within USPV's business location.

Overt Act No. 3:  On or about December 11, 2019, during discussions for the sale of cocaine, USPV Officer instructed the buyer, Confidential Informant 3, to use a wireless communication application called "Signal," which is encrypted to communicate with him regarding the transaction.

Overt Act No. 4:  On or about December 16, 2019, USPV Officer instructed Confidential Informant 3 to come to USPV to complete the exchange.

Overt Act No. 5:  On or about December 16, 2019, USPV Manager called Confidential Informant 3 and explained that co-conspirator USPV Officer was not being careful enough, and could bring unwanted law enforcement attention to defendant USPV by conducting this drug deal onsite.

Overt Act No. 6:  On or about December 18, 2019, USPV Officer sold an ounce of cocaine to Confidential Informant 3 through intermediaries.

COUNT THREE

[18 U.S.C. § 371]

8.   The Grand Jury realleges paragraph 1 of this Indictment here.

A.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or before 2019, and continuing through the date of this Indictment, in Los Angeles County, within the Central District of California, and elsewhere, defendant U.S. PRIVATE VAULTS, INC. conspired with others known and unknown to the Grand Jury to knowingly and for the purpose of evading the reporting requirements of Section 5331 of Title 31, United States Code, and the regulations promulgated thereunder: (1) cause and attempt to cause a nonfinancial trade or business to fail to file a report required under Section 5331 of Title 31, and any regulation prescribed under any such Section, in violation of Title 31, United States Code, Section 5324(b)(1); and (2) structure, assist in structuring, and attempt to structure and assist in structuring, transactions with one or more nonfinancial trades or businesses, in violation of Title 31, United States Code, Section 5324(b)(3).

B.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were carried out, and to be carried out, as described in paragraph 3 of this Indictment, which the Grand Jury realleges here.

C.   OVERT ACTS

11.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendant USPV, acting through its officers and managers, committed various overt acts within the Central District of California, including but

8

not limited to the following:

Overt Act No. 1:  On December 4, 2019, Gold Business sold jewelry for $11,900 in cash to a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 1"), and did not file the required IRS Form 8300.

Overt Act No. 2:  On January 13, 2020, USPV Representative One told a customer of USPV who was also a confidential informant working with law enforcement ("Confidential Informant 4"), and who expressed an interest in buying $20,000 worth of precious metals in cash, to purchase only $10,000 at a time to avoid paperwork.

Overt Act No. 3:  On January 28, 2020, USPV Representative Two told a DEA agent who was posing as a USPV customer and said he wanted to purchase $18,000 in gold, "I recommend you stay under $10,000 in cash and then you could just do some one day, and a few days later you could do the other," and explained, "If you buy less than $10,000 then there's no form."

Overt Act No. 4:  On January 29, 2020, USPV Manager instructed Confidential Informant 3, who wanted to buy gold to pay a "skante" debt "down south," meaning a debt in Mexico for methamphetamine, to keep his purchases under $10,000 each:  "That way you don't have to give no social security, no ID. All that shit goes to the IRS."  USPV Manager introduced Confidential Informant 3 to co-conspirator USPV Representative One to purchase the gold.

Overt Act No. 5:  On January 29, 2020, USPV Representative One explained to Confidential Informant 3 and his friend, who was actually an undercover police officer ("Undercover Officer"), that it was better to space out his cash purchases and keep each one under

$10,000:  "Don't come in every day. . . . what they look for is a pattern of someone who with intention is trying to get around . . ."

Overt Act No. 6:  On January 29, 2020, when Undercover Officer explained that he needed more than $10,000 worth of gold quickly, USPV Manager suggested that he split the purchase between himself and Confidential Informant 3, so that each purchase would be under $10,000 individually.  USPV Representative One agreed to the ruse "as long as you hand me the money" separately and fill out receipts for two separate transactions.  USPV Representative One also agreed that Undercover Officer could pick up the total gold purchase alone the following day.

Overt Act No. 7:  On January 29, 2020, USPV Representative One accepted first $9,900 in cash from Undercover Officer and then another $5,000 which Undercover Officer handed to Confidential Informant 3, who then handed it to USPV Representative One.

Overt Act No. 8:  On January 30, 2020, USPV Representative One delivered nine ounces of gold bullion to Undercover Officer.

Overt Act No. 9:  On November 17, 2020, USPV Manager accepted $25,000 in cash from Confidential Informant 3, who said it was from the sale of "skante" (methamphetamine), and structured the transfer of it to Gold Business in exchange for wire transfers of $10,000 and $12,000, purportedly from the sale of gold, to launder the cash.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of defendant USPV's conviction under Count One of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

      a.  All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Count One of this Indictment, including, without limitation the property set forth in paragraph 3 below; and

      b.  A sum of money equal to the total value of the property described in subparagraph a above.

3.   The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

      a.   The business computers;

      b.   The money counters;

      c.   The nests of safety deposit boxes and keys;

      d.   The digital and video surveillance and security equipment; and

      e.   The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b),

11

defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[21 U.S.C. § 881(a)(6), 28 U.S.C. § 2461(c)

and 21 U.S.C. § 853]

1.   Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 21, United States Code, Section 881(a)(6), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, in the event of defendant USPV's conviction under Count Two of this Indictment.

2.   Defendant USPV shall forfeit to the United States the following property:

a.   All right, title, and interest in any and all property, real or personal:

i.   constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; or

ii.   used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the offense set forth in Count Two of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b.   A sum of money equal to the total value of the property described in subparagraph a above.

///

13

3.    The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on one or more of the grounds set forth in paragraph 2 above:

       a.    The business computers;

       b.    The money counters;

       c.    The nests of safety deposit boxes and keys;

       d.    The digital and video surveillance and security equipment; and

       e.    The biometric scanners.

4.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[31 U.S.C. § 5317(c) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to defendant U.S. PRIVATE VAULTS, INC. that the United States will seek forfeiture as part of any sentence in accordance with Title 31, United States Code, Section 5317(c), and Title 28, United States Code, Section 2461(c), in the event of defendant USPV's conviction under Count Three of this Indictment.

2. Defendant USPV shall forfeit to the United States the following property:

a. All right, title, and interest in any and all property, real or personal, involved in or traceable to the offense set forth in Count Three of this Indictment, including, without limitation, the property set forth in paragraph 3 below; and

b. A sum of money equal to the total value of the property described in subparagraph a above.

3. The Grand Jury finds probable cause to believe that the following property, located at U.S. PRIVATE VAULTS, INC., 9182 WEST OLYMPIC BLVD., BEVERLY HILLS, CA 90212, is subject to forfeiture on the grounds set forth in paragraph 2 above:

a. The business computers;

b. The money counters;

c. The nests of safety deposit boxes and keys;

d. The digital and video surveillance and security equipment; and

e. The biometric scanners

4. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 31, United States Code, Section

15

5317(c)(1)(B), and Title 28, United States Code, Section 2461(c), defendant USPV shall forfeit substitute property, up to the value of the property described in paragraph 2 above if, as the result of any act or omission of defendant USPV, the property described in paragraph 2 above or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
_____
Foreperson

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

ANDREW BROWN
Assistant United States Attorney
Major Frauds Section